# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | BANKRUPTCY NO. 19-52375-RBK |
| STONE OAK MEMORY CARE, LLC | § | |
| | § | CHAPTER 11 PROCEEDING |
| DEBTOR | § | |

**DECLARATION OF DARRYL FRELING IN SUPPORT OF FIRST-DAY MOTIONS**

I, Daryl Freling, state and declare as follows:

1. I am over 18 years of age and if called upon I would competently testify to the matters set forth herein from my own personal knowledge or from knowledge gathered from others within my review of relevant documents, or my opinion based upon my experience.

2. I am the President of MedProperties Stone Oak Manager. LLC, the managing member of Stone Oak Memory Care, LLC ("Stone Oak" or "Debtor"). I am also a manager of MedProperties Stone Oak, LLC ("MedProperties"), the largest equity investor in Stone Oak.

3. MedProperties is a Dallas Texas based real estate private equity firm focused exclusively on investments in healthcare real estate. I oversee the overall operations and financial management of MedProperties and its related funds, as well as the sourcing, structuring and execution of MedProperties related investments. Since its inception in 2007, MedProperties has invested in over 100 healthcare properties totaling 4 million square feet in 23 states, with a value in excess of $1.2 billion. Affiliates of MedProperties have invested in memory care facilities in Texas and other states and have been involved in Stone Oak since its inception and development in 2013.

4. I hold MBA and JD degrees from the University of Texas and Austin. I have over 35 years of experience in the areas of both corporate and real estate investment (private and public), real estate development and management, complex business structures, and finance.

5. Based upon my personal knowledge of the Debtor, its business operations, history, industry, and books and records, and based upon information contained in the Debtor's books and records, I am qualified to give this declaration (the "First Day Declaration") on behalf of the Debtor.

6. Some of the information presented below is based upon my review of data regularly compiled by the Debtor in the ordinary course of its business.

7. I submit this Declaration in support of the following motions (collectively, the "First Day Motions"):

   a. *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, And 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Docket No.3];*

   b. *Debtor's Expedited Motion to Establish Notice Procedures ("Notice Motion") [Docket No.6];*

   c. *Debtor's Emergency Motion for an Order Under 11 U.S.C. §§105, 363, and 507 (I) Authorizing Payment of Pre-Petition Employee Obligations and Related Amounts, (II) Confirming Debtor's Right to Pay Withholding and Payroll-Related Taxes and (III) Directing Banks to Honor Pre- Petition Checks for Employee Obligations (the "Prepetition Wages Motion") [Docket No. 4];and*

   d. *Debtor's Emergency Motion For Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment [Docket No.5].*

## BACKGROUND

8. On September 30, 2019 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby initiating the above-captioned bankruptcy case and creating its bankruptcy estate (the "Estate").

9. The Debtor continues to operate and to manage its business as "debtor-in-possession" pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the above-captioned bankruptcy case (the "Chapter 11 Case") pursuant to Section 1104 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in the Chapter 11 Case at this time.

10. The Debtor owns a memory care assisted living community located at 20271 Stone Oak Parkway, San Antonio, Texas. The community currently does business as Autumn Leaves of Stone Oak, although the Debtor anticipates rebranding the property in the next 30 days. The facility consists of a 50 bed assisted living facility designed specifically for people with Alzheimers's and other forms of dementia.

11. Prior to the Petition Date, the Debtor's was managed by the LaSalle Group, Inc. ("LaSalle") and its affiliates. LaSalle was the managing member of the Debtor and holds a minority ownership interest in the Debtor. Shortly before the Petition Date, MedProperties Stone Oak Manager. LLC replaced LaSalle as the Debtor's managing member. By agreement between MedProperties and LaSalle, American Healthcare Management replaced LaSalle as the operational manager of the facility as well.

12. On or about March 28, 2013, Stone Oak executed that certain *Promissory Note* in favor of Frost Bank ("Frost") in the original principal amount of $8,011,000 (the "Frost Note"). The Frost Note was secured by the real estate located at 20271 Stone Oak Parkway, San Antonio, Texas 78258 pursuant to that certain *Deed of Trust* recorded in the real property records of Bexar County on April 1, 2013. Frost filed a UCC-1 financing statement with the Delaware Secretary of State that was continued in January 18, 2018. The Frost Note was modified by that certain Modification, Renewal and Extension Agreement ("Frost Loan Modification") dated August 15, 2018.

13. The increase in supply of assisted living facilities has made the market more competitive, affecting occupancy and rental rates. In a competitive market competent management is imperative. LaSalle and its' affiliated facility management company, TLG Family Management, LLC ("TLG"), beset with their own financial problems over the last several years failed to properly manage the Stone Oak property. In May of 2019, the LaSalle Group filed for bankruptcy relief under chapter11 in the Northern District of Texas.

14. Under LaSalle's management, LaSalle allocated excessive corporate overhead to Stone Oak and failed to properly manage operating expenses. Poor management coupled with LaSalle's well publicized problems and bankruptcy damaged Stone Oak's reputation in the marketplace and the community in which the Stone Oak property is located.

15. In 2018, the Frost Loan became delinquent as a result of the declining performance of the property under LaSalle's management. Stone Oak was also in default in the payment of its ad valorem taxes. MedProperties negotiated the Frost Loan Modification with Frost and loaned approximately $1.1 million in additional funds to Stone Oak to provide needed liquidity to pay the ad valorem taxes and satisfy Frost's requirements to modify the Frost Loan.

16. After LaSalle filed bankruptcy, Frost sold the Frost Note along with the liens securing that note to LSLH Trust ("LSLH") by an Assignment of Liens recorded in Bexar County real property records on July 3, 2019. The Frost Note once again fell into default and LSLH noticed the property for a non-judicial foreclosure sale to occur on October 1, 2019.

17. As of the Petition Date, Stone Oak believes the principal amount owed on the Frost Note is approximately $6,900,000 million.

## THE FIRST DAY MOTIONS

18. Contemporaneously herewith, the Debtor has filed the First Day Motions listed above seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, minimize the adverse effects of the commencement of the Chapter 11 Case, and facilitate the efficient administration of the Chapter 11 Case. In connection with the preparation for this bankruptcy proceeding, I have reviewed each of the First Day Motions. I believe that the entry of orders granting the relief requested in these Motions is critical to the Debtor's ability to continue in operation, and thus maximize the return to its estate and creditors.

19. The First-Day Motions are identified and more fully described below.

A. Motion to Limit Notice

20. The Debtor filed the Notice Motion to request modification of noticing procedures in order to preserve the limited resources of the Debtor. Accordingly, as part of the Notice Motion, the Debtor requests that all filings in these cases, except those identified in Bankruptcy Rules 2002(a)(1) and (4)-(7); Bankruptcy Rule 2002(b); and (c) Bankruptcy Rules 2002(f)(1)-(3) and (5)-(7), be served upon the parties and entities on the following limited service list (the "Limited Service List"):

(a) The Debtor and its proposed counsel, Law Offices of Ray Battaglia, PLLC;

(b) The Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee");

(c) Counsel to the Debtor's pre-petition secured lender;

(d) The 20 largest unsecured creditors, unless and until such time as an official committee of unsecured creditors is appointed, if any;

(e) Counsel to any official committee established in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, if any;

(f) The Office of the Attorney General of the State of Texas (the "Texas Attorney General");

(g) The Internal Revenue Service;

(h) The Office of Health and Human Services; and

(i) All parties who have filed a notice of appearance and request for notice or service of all pleadings pursuant to Bankruptcy Rule 2002.

21. Furthermore, the Debtor requests authority to serve all filings for which particular notices are required by Bankruptcy Rules 2002(a)(2), 2002(a)(3), 4001, 6004, 6006, 6007 or 9019 on the parties identified on the Limited Service List in addition to the persons or entities set forth below, in accordance with the following procedures, unless otherwise authorized by this Court:

a) Filings relating to the use, sale, lease or abandonment of property other than in the ordinary course of business shall be served on each entity having an interest in the property;

b) Filings related to relief from, or otherwise related to, the automatic stay shall be served on each entity having a lien or encumbrance on the affected property;

c) Filings relating to the use of cash collateral or obtaining credit shall be served on each entity with an interest in the cash collateral or each entity with a lien or other interest in property on which a lien is proposed to be granted;

d) Filings relating to approval of proposed compromises or settlements shall be served on any entity that is a party to the compromise or settlement or which may be materially adversely affected thereby; provided, however, the Debtor may seek additional relief from the Court in order to determine how the notice of such settlement should be implemented;

e) Filings relating to rights under section 365 of the Bankruptcy Code shall be served on each counterparty to the executory contract(s) or unexpired lease(s) affected thereby; and

f) Notice of other matters for which the Bankruptcy Rules require notice to all parties in interest shall be served on all creditors of the Debtor and parties in interest, unless otherwise authorized by this Court.

22. All other filings the Debtor proposes to serve upon the parties identified on the Limited Service List and each entity with a particular interest in the subject of the filing.

**DECLARATION OF DARRYL FRELING IN SUPPORT OF FIRST-DAY MOTIONS**  **PAGE 5 OF 10**

23. Moreover, for Debtor's residents, the Debtor requests authority to provide required notices to the responsible parties' that have been designated by the residents for making medical, legal, and financial decisions ("Major Decisions"). The Debtor's residents have medical conditions that impair cognitive function such that they cannot make Major Decisions for themselves and have, therefore, delegated that decision-making authority to other care-givers or family members in the intake records and paperwork maintained by the facilities (the "Responsible Party"). Sending notices regarding the bankruptcy proceedings to the residents directly would cause confusion and upset that is unnecessary given that each individual has a designated Responsible Party. In fact, it is the Debtor's policy that residents do not even receive mail.

24. Generally speaking, many lay people use the phrases "mild stage", "middle stage", and "late stage" dementia to describe a sufferer's severity. However, there are scales that exist that are more comprehensive in description and provide a better understanding of the cognitive decline. Such scales include the Global Deterioration Scale for Assessment of Primary Degenerative Dementia ("GDS"), the Functional Assessment Staging Test, and the Clinical Dementia Rating.

25. The most commonly used scale is the GDS, or by its more formal name, the Reisberg Scale. The GDS scale divides the disease process into seven stages based on the amount of cognitive decline in the inflicted senior. This test is most relevant for people who have Alzheimer's disease since some other types of dementia (i.e. Frontotemporal dementia) do not always include memory loss, however, for functionality it is still a good benchmark.

26. In the scale, elders in stages 1-3 do not typically exhibit enough symptoms for a dementia diagnosis. By the time a diagnosis has been made, a dementia patient is typically in stage 4 or beyond. As such, the Memory Care Facilities typically see residents only from stages 5 and 6 which are considered "middle dementia", and stage 7 considered "late dementia." By stage 5, most people suffering from dementia have trouble remembering their own address, phone number and other basic information. It is highly likely that receiving a legal notice of any kind, much less one notifying them of a bankruptcy filing, would cause the Memory Care Facility residents undue emotional trauma. Therefore, the Debtor seeks to honor the wishes of

the residents and their families by sending all communications to the responsible parties designated by those parties in their intake paperwork.

B.  Motion to Pay Pre-Petition Wages

27. The Debtor employs 34 employees on an indirect basis through the Management Company. The employees provide services exclusively to Stone Oak. Stone Oak funds the entire payroll (including 940 and 941 taxes) to the Management Company on a pass-through basis. Currently all employees earn and are paid compensation on a bi-weekly basis.

28. The Debtor's next bi-weekly payroll will be for September 18 through September 28, 2019 due on October 9. The bi-weekly pay must be funded on or before October 6, 2019 in order for payroll to be timely processed. As of the Petition Date, the Debtor estimates its pre-petition gross payroll obligations will be approximately $23,238.85. Also, payroll for the period from September 29 through 30, 2019 will be due on October 23, 2019 in the approximate amount of $4,647.77 for a total pre-petition payroll in the approximate amount of $27,886.62, including applicable state, local and federal tax withholdings. (the "Pre-Petition Wages").

29. All of the employees' Pre-Petition Wages that the Debtor seeks to pay are less than the priority wage allowance of $12,850 under Section 507(a)(4) of the Bankruptcy Code. A breakdown of the employee salaries by employee will be provided to the U.S. Trustee's office.

30. As employees of LaSalle Group, full time employees had additional benefits, including (i) medical, dental, vision, and prescription drug coverage; (ii) flexible spending accounts, (iii) life insurance, (iv) accidental death and dismemberment ("AD&D") insurance, (v)employee life assistance program, (vi) critical illness insurance, (vii) 401(k) benefits, (viiii) tuition reimbursement, (ix) paid time off benefits, and (x) workers' compensation insurance (collectively, the "Employee Benefits"). In general, the Employee Benefits begin on the first day of the month following 30 days of full-time employment. However the transition of the employees from the LaSalle Group to American Healthcare Management Group will require additional time to sort out the Debtor's pre-petition obligation for any of these benefits, many of which were paid by LaSalle Group through the end of September 2019.

31. The Debtor seeks authority to pay all (i) Pre-Petition Wages, (ii) Withholdings, and (c) Employee Benefits, totaling approximately $27,886.62.

C. <u>Cash Collateral Motion</u>

32. The Debtor seeks authority, on an emergency and interim basis, to use alleged cash collateral for reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, food, laundry service for residents, maintenance of real property, lease payments, medical supplies, taxes, and insurance as set forth on Exhibit A hereto. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of collateral and the Debtor's estate for the benefit of all creditors, including the secured lender referenced herein, and any other secured creditors purporting to hold an interest in the Debtor's cash collateral during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period"). The Debtor also requests that continued use of cash collateral is equally necessary to preserve all of the values and rights of the above constituencies during the life of this Chapter 11 Case.

33. Without the authority to use cash collateral, the Debtor will be unable to fund its business operations in a manner that will allow the Debtor to continue to operate, to the detriment of all of the Debtor's creditors, including the lenders referred to herein and the unsecured creditors, not to mention potential harm to the Stone Oak residents. Furthermore, without the ability to fund continuing operations, the Debtor and its estate will suffer immediate and irreparable harm. For example, employees will not continue to provide services if they are not paid the wages for which they have already worked and suppliers will not continue to provide necessary food or medical supplies if they are not paid for such supplies. Therefore, the Debtor requests the interim usage of cash collateral on an emergency basis.

34. The interests of the secured creditors will be adequately protected by the expenditure of cash collateral to provide for the maintenance of the Stone Oak property which collateralizes their debt. The continuation and improvement of the Debtor's operations will improve the debtor's cash flow to the benefit of the secured creditors as well as all other creditors.

35. To the extent that I subsequently discover any facts bearing on this Declaration, this Declaration will be supplemented, and those facts will be disclosed to the Court at the earliest opportunity.

Pursuant to 28 U.S.C. §1746(2) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 30, 2019

_____
Darryl Freling
President

## CERTIFICATE OF SERVICE

      A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail on September 30, 2019 to the parties on the attached service list

                                               */s/ Raymond W. Battaglia*
                                               Raymond W. Battaglia